**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.**

CAPT. TRACY G. BOWDEN,
SILVER BANK EXPEDITIONS, INC.,

       Plaintiffs,

vs.

ROBERT KURSON, PENGUIN
RANDOM HOUSE, LLC, and RANDOM
HOUSE LLC,

       Defendants.
_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, TRACY G. BOWDEN and SILVER BANK EXPEDITIONS, INC., sue Defendants, ROBERT KURSON, PENGUIN RANDOM HOUSE, LLC, and RANDOM HOUSE LLC, and allege:.

**PARTIES**

1.    Tracy G. Bowden, Plaintiff, whose address is 24 Country View Drive, Blairsville, Georgia 30512, is a citizen of the state of Georgia.

2.    Silver Bank Expeditions, Inc., is a Florida Profit Corporation incorporated in 2002. Its current mailing address is 24 Country View Drive, Blairsville, Georgia 30512, and its officer/director is Tracy G. Bowden.

3.    Upon information and belief, Robert Kurson, Defendant, has an address of 1259 Walters Avenue, Northbrook, Illinois 60062, and is a citizen of the state of Illinois. Mr. Kurson is the author of a book that is at issue in events giving rise to this Complaint.

4. Random House, LLC is a wholly-owned subsidiary of Penguin Random House, LLC, which is a joint venture of two members: Pearson Publications, Inc. and PRH Holdings, Inc. Both Pearson and PRH Holdings are corporations organized under the laws of the State of Delaware and each has its principal place of business in New York, New York. Random House, LLC and Penguin Random House, LLC are publishers of a book that is at issue in this Complaint.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. § 1332(a), as the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the controversy is between parties who are citizens of different states.

6. Venue is proper in this Court as the Plaintiffs were residents of the Southern District of Florida at the time of acts by Defendants that have given rise to this Complaint, harm alleged by Plaintiffs was incurred within the Southern District of Florida, and the book at issue in this Complaint was sold in the state of Florida and in the Southern District of Florida.

## FACTUAL BACKGROUND

7. Tracy G. Bowden has been in the business of underwater excavation and salvage for decades.

8. Capt. Bowden's work has earned him a national reputation as a leader in his field.

9. An article published in The Washington Post on April 10, 1981, began with the following: "Captain Tracy Bowden is among the most successful of treasure hunters, but there's devil a bit of swash nor buckle about him. Bowden, 41, led an expedition that salvaged two of the most fabulous sunken Spanish ships ever found," the *Conde de Tolosa* and *Nuestra Senora de Guadalupe*, both of which sank off the Dominican Republic in 1724.

10. Capt. Bowden's discoveries and recoveries of artifacts have twice been the subject of articles and photographic displays published by National Geographic magazine. These were published in 1979 and 1996. Capt. Bowden himself authored the 1996 article, which concerned the recovery of artifacts from the 1641 shipwreck of the Spanish galleon *Nuestra Senora de la Pura y Limpia Concepcion*.

11. Other excavations by Capt. Bowden and teams working for him include three French warships, *Scipion, Diomede,* and *Imperial.*

12. For decades, Capt. Bowden and/or entities in which he has interests have held leases with the government of the Dominican Republic permitting Capt. Bowden to explore Dominican waters in search of sunken vessels. Such waters included Samana Bay.

13. In January 2008, Bowden, acting both individually and as president of Silver Bank Expeditions, Inc., entered into an agreement with an entity named Underwater Archeology and Exploration Corporation ("UA+E") for certain work within the lease area controlled by Capt. Bowden. That 2008 Agreement states,

> The underlying intent of this Agreement is that UA+E will use all of their expertise and equipment on a full time basis to locate shipwrecks that are of either historical or commercial value, and that [Silver Bank] Expeditions believes are worthy of salvage, and UA+E will give this information to Expeditions for later excavation and recovery by Expeditions.

*Agreement*, attached to this Complaint as Exhibit 1, at 1 ¶ I.

14. The Agreement expressly states that UA+E would have access to and be able to perform such work in Silver Bank Expedition's "entire Samana Bay permit area, (*less the six excluded wreck sites* as listed below under 'D')." *Id* ¶ II.C (emphasis added).

15. Paragraph D states, "The excluded ongoing shipwreck sites are: **Bannister's pirate ship**, the San Miguel Galleon, an unknown nationality shipwreck treasure site, the

3

Scipion, the Guadalupe and the Tolosa Galleons." *Id.* at 1 ¶ II. D (emphasis added). "UA+E agrees to respect and be governed by Expeditions['s] identification of these six wreck sites and not to challenge said identifications in any manner, shape or form." *Id.*

16. The Agreement further provided,

> No rights to the use of Tesoros',[1] Expeditions', or Bowden's name, image, likeness, photo, biographical information, nor any information of any sort or kind of their ongoing or past shipwreck salvage history and recovery in the Dominican Republic are implied in this agreement unless Bowden consents to these rights and does so in writing.

*Id.* at 3 ¶ V.

17. On June 16, 2015, Defendant Penguin Random House, through its imprint and trade division, Random House, published a book, *Pirate Hunters: Treasure, Obsession, and the Search for a Legendary Pirate Ship*. The author was Mr. Kurson.

18. *Pirate Hunters* was purportedly based upon interviews Mr. Kurson conducted with the two principals of UA+E, John Chatterton and John Mattera.

19. *Pirate Hunters* purported to tell the story of the discovery of a shipwreck, the *Golden Fleece*, in Samana Bay by Mr. Chatterton and Mr. Mattera in approximately March or April 2009. The *Golden Fleece* was a pirated ship that was under the command of the British pirate Joseph Bannister when it was sunk in 1686 following a two-day battle with two British warships in what is now Samana Bay, Dominican Republic.

20. As a matter of fact, the location of the *Golden Fleece* was first identified by Capt. Bowden.

---

[1] Tesoros del Caribe S.A.S. is a Dominican Republic corporation. Capt. Bowden is its president. In 2008, its name was Tesoros del Caribe S.A.

21. *Pirate Hunters* is replete with not just factual errors, but grossly false inventions of fact.

22. *Pirate Hunters* asserts that Capt. Bowden solicited Mr. Chatterton and Mr. Mattera in "early 2008" in order to offer them "a deal.  He would give them 20 percent of the *Golden Fleece* if they found the pirate wreck for him."[2]  This is false.  As the 2008 Agreement between Silver Bank and UA+E expressly states, the scope of work for which Silver Bank was retaining UA+E excluded the location of "Bannister's pirate ship."  Ex. 1 at 1 ¶ II.C-D.  Further, the Agreement contains no such "20 percent of the *Golden Fleece*" provision.  Accordingly, as a simple reading of this Agreement shows, Capt. Bowden did not solicit Mr. Chatterton and Mr. Mattera to help him find the *Golden Fleece* and thus the entire premise of the book *Pirate Hunters* is false.

23. On page 6 of *Pirate Hunters*, Capt. Bowden is quoted as saying to Mr. Chatterton and Mr. Mattera in the early 2008 meeting at his home in Miami: "This is the greatest pirate story ever. … And no one knows about it.  I want the *Golden Fleece*.  And I think you guys [Chatterton and Mattera] can help find her."  This is false.  Capt. Bowden did not speak these words.  He did not ask Chatterton and Mattera to help him find the *Golden Fleece*.  As set out above, under the contract executed in January 2008 between Silver Bank Expeditions and the Chatterton-Mattera entity "UA+E," the location of "Bannister's pirate ship" was one of six "ongoing shipwreck sites" *specifically excluded* from the scope of the work to be performed by UA+E for Capt. Bowden.  Ex. 1.  The entire idea that Capt. Bowden solicited Chatterton and Mattera to help him find the *Golden Fleece* – the fundamental theme of *Pirate Hunters* – did not occur and is a fiction.

---

[2] *Pirate Hunters* at p. 7.

24. *Pirate Hunters* further asserts on pages 4-5 that Mr. Chatterton and Mr. Mattera in early 2008 observed a huge quantity of valuable artifacts in Capt. Bowden's home, including salvaged silver coins in plastic bags piled in a bathtub in Capt. Bowden's home's bathroom. By Mr. Mattera's estimate, according to a passage in *Pirate Hunters,* the coins constituted "five million dollars in treasure, all bundled in the cheapest baggies he'd ever seen, not even with Ziploc tops."[3]  This is false. Capt. Bowden has no such cache of silver coins and never kept any silver coins, or any other ancient artifacts, in his bathtub.  As a result of this invention, Capt. Bowden incurred profound emotional stress, including loss of security and intense fear of burglary or robbery in his home. This false characterization of the inside of Capt. Bowden's home caused him such extreme distress that, for the first time in his life, he began to live with guns as a constant presence in his Miami home and, eventually, had to leave Miami.

25. Capt. Bowden was portrayed throughout *Pirate Hunters* as a washed-up has-been entrenched in archaic search methods, in need of modern equipment provided by UA+E, such as sonar scanners and magnetometers. The book states at one point that "Bowden had never gone in for technology like that."[4]   This is false. *Pirate Hunters* further asserted on page 4 that Capt. Bowden "used little of the modern technology that had revolutionized underwater salvage, relying instead on old drawings, aging equipment, and his own decades-old notes …" This is false. In fact, the 1996 article that Capt. Bowden wrote for National Geographic describes the use of magnetometers in the excavation of the *Concepcion* more than a decade before the contract with UA+E.

26. *Pirate Hunters* contains numerous accounts of purported conversations in which Capt. Bowden was a supposed participant, including reconstructed alleged direct quotations

---

[3] *Id.* at p. 5.
[4] *Pirate Hunters* at p. 7.

attributed to Capt. Bowden in conversations conducted years earlier.  In all respects, these numerous recreated alleged accounts are false.

27.     For example, purported conversation set out on page 172-173, involving Capt. Bowden, is pure fiction.  Here, Capt. Bowden is portrayed as insisting that Mr. Chatterton and Mr. Mattera press on with the search for the *Golden Fleece* at Cayo Levantado, rather than at Cayo Vigia, where Chatterton and Mattera purportedly had concluded that it would be found.  The men argued, according to *Pirate Hunters*.  Chatterton is reported in the book to have told Capt. Bowden: "Accept that the pirate ship ain't at Levantado.  It's at Cayo Vigia."  The book states that Bowden refused to accept that conclusion.  "Keep looking" at Levantado, Capt. Bowden is quoted as telling the men.  "Maybe you missed something.  Maybe the mag's not working right . . ."  Chatterton is quoted as stating: "What about the four hundred other things we found there? Are you saying we found every goddam fish trap and license plate around all of Levantado, but somehow missed a one-hundred-foot pirate ship?"  Bowden insists, according to the book: "We just need to be sure."  These quotations are false.  They are part of a false narrative in the book that falsely portrays Chatterton and Mattera as having identified the correct vicinity of the *Golden Fleece* at a time when Capt. Bowden was clinging to the incorrect location.  No such events occurred.  This falsity harms Capt. Bowden's reputation by portraying him as an obstacle to the discovery of the *Golden Fleece* when, in fact, *he* is the person who identified the actual location of the Bannister ship, not Chatterton and Mattera. If Mr. Kurson had bothered to interview Capt. Bowden about this supposed argument as set out on pages 172-173, and not chosen to remain willfully ignorant of it, Capt. Bowden could have enlightened him about this gross and harmful mischaracterization of Capt. Bowden.  But, Kurson did not.

28.     Similarly, the conversation constructed on page 181 is more fiction. Page 181 attributes the following to Mattera as he "looked straight into Bowden's eyes": "The wreck's not at Levantado. It's right here [at Vigia]." *Pirate Hunters* reports that "Bowden held firm" to his insistence that the wreck was at Levantado. This is false. It again portrays Bowden as an obstacle to a discovery that in fact he himself had made.

29.     *Pirate Hunters* piled other falsities upon other falsities throughout its 262 pages with regard to Capt. Bowden and the purported discovery of *The Golden Fleece* by Mr. Chatterton and Mr. Mattera. The product of these mischaracterizations contained in *Pirate Hunters* is, among other things, a general characterization of Capt. Bowden as stubborn, unimaginative, resistant to fresh ideas, uncomfortable with modern technology and out of date in his field. This general characterization is false and defamatory.

30.     The plain thrust of the narrative set out on the dust jacket of the hardcover edition of *Pirate Hunters*, and on the back cover of the paperback edition, is that Chatterton and Mattera discovered the Bannister shipwreck. Bowden's name does not even appear on the dust jacket/back cover narrative. It is Chatterton and Mattera, according to that narrative, who "are willing to risk everything to find the *Golden Fleece*. ... But it's only when they learn to think and act like pirates – like Bannister – that they become able to go where no pirate hunters have gone before." In fact, Capt. Bowden applied exactly that same logic in identifying the location of the Golden Fleece himself.

31.     Thus, the central assertion of *Pirate Hunters* – that Mr. Chatterton and Mr. Mattera discovered the *Golden Fleece* – is false. It serves to credit to Mr. Chatterton and Mr. Mattera, falsely, for an achievement that in fact belongs to Capt. Bowden.

32.  All of the events referenced above in paragraphs 22-31 of this Complaint harmed Capt. Bowden's personal and business reputations and caused decline in business receipts for Capt. Bowden and entities he controls, including Silver Bank.

33.  Mr. Kurson never interviewed Capt. Bowden about any of the events referenced above in paragraphs 22-31 of this Complaint.  Additionally, neither Defendant Penguin Random House, LLC nor Random House, LLC interviewed Capt. Bowden or made any other efforts to verify the accuracy of the events referenced above in paragraphs 22-31 of this Complaint.

34.  On February 13, 2012, Mr. Mattera, by email, told Capt. Bowden that Mr. Kurson was researching a book about the field of "the treasure business" and wanted to interview Capt. Bowden. *Mattera Email*, attached as Exhibit 2.

35.  Capt. Bowden agreed to meet Mr. Kurson at his home shortly thereafter.  On that occasion, Capt. Bowden, Mr. Mattera and Mr. Kurson talked for approximately three hours about the general subject of treasure hunting.  Mr. Kurson recorded the conversation.  Mr. Kurson represented to Capt. Bowden that he (Capt. Bowden) was one of a number of people in "the treasure business" whom Mr. Kurson intended to interview for his planned book.

36.  After their meeting in 2012, Mr. Kurson never informed Capt. Bowden that he was writing a book about the search for the *Golden Fleece*, and never interviewed Capt. Bowden about the subject matter of the book.  More than three years later, on June 19, 2015, Mr. Kurson sent the following email to Capt. Bowden:

> Dear Tracy,
>
> I sent you an email earlier, and left you voice messages on your cell phone and at your home.  Since I didn't hear back from you, I wanted to follow up with this email.
>
> My new book, Pirate Hunters, went on sale Tuesday.  ***It's about the search for the Golden Fleece.***

9

> ***I wanted to let you know that the first chapter describes*** a meeting between you, John Chatterton and John Mattera at your home in Miami.
>
> Included in the description is mention that there was ***a lot of treasure (silver pieces of eight) in your bathtub, and that there were valuable artifacts in your living room and on the shelves***. This chapter recently was excerpted on a popular internet site, too.
>
> I'd love to hear from you sometime, Tracy. I very much enjoyed our ***conversation***.
>
> Best,
> Rob Kurson

*Kurson Email*, attached as Exhibit 3 (emphases added).

37. In this email on June 19, 2015, Mr. Kurson plainly was *informing* Capt. Bowden *for the first time* that he had written a book, that the book was "about the search for the Golden Fleece," and that it had just gone on sale three days earlier.

38. Further, Mr, Kurson in this email plainly was informing Capt. Bowden for the first time also that he was publishing assertions that Capt. Bowden kept large amounts of treasures in his home, including silver pieces in his bathtub.

39. Additionally, Mr. Kurson acknowledged in this email that he had had only one "conversation," singular, with Capt. Bowden in the past, which would have been the one arranged through Mr. Mattera's email in 2012.

40. In sum, although three years had passed during which Mr. Kurson researched and wrote *Treasure Hunters*, he never told Capt. Bowden during that time about the content of the book, remaining willfully ignorant of the truth as he could have learned it from Capt. Bowden.

41. None of the Defendants asked Capt. Bowden in any detail whatsoever about the subject matter published in *Pirate Hunters* regarding the search for the *Golden Fleece*; the

Agreement between Silver Bank and UA+E; Capt. Bowden's reputation as portrayed in *Pirate Hunters*; who it was who discovered the *Golden Fleece* and how it was discovered; any conversations in which Capt. Bowden was a participant; and any other factual matters central to the harm Capt. Bowden has suffered.

42. These failures constitute negligence and actual malice on the part of Mr. Kurson, Penguin Random House and Random House.

## CAUSES OF ACTION

### COUNT I
### DEFAMATION (LIBEL) AGAINST ALL DEFENDANTS

43. Paragraphs 1 through 42 above are incorporated into this Paragraph 43.

44. As set out above, Defendants published a book making the false assertions that Capt. Bowden retained Mr. Chatterton and Mr. Mattera to help him discover the *Golden Fleece* and that they proceeded to discover it, when in fact the location of that vessel was first identified by Capt. Bowden.

45. Accordingly, Defendants have published false statements about Capt. Bowden and Silver Bank to third parties. These falsities caused injury to Capt. Bowden in the form of harm to his personal and business reputation and harm to the reputation of Silver Bank.

46. Defendants did so with negligence and with actual malice. Defendants remained willfully ignorant of the truth by failing over three years' time to ask Capt. Bowden about the truth or falsity of these assertions.

47. Damages suffered by each Plaintiff far exceed $75,000.

48. Accordingly, Plaintiffs are entitled to all damages for defamation allowed by law against Defendants.

## COUNT II
## DEFAMATION (LIBEL) AGAINST ALL DEFENDANTS

49. Paragraphs 1 through 48 above are incorporated into this Paragraph 49.

50. As set out above, Defendants published a book making the false and comical assertion that Capt. Bowden recklessly kept salvaged items worth millions of dollars in his home in Miami, including silver pieces worth millions of dollars piled high in his bathtub.

51. Accordingly, Defendants have published false statements about Capt. Bowden and Silver Bank to third parties. These falsities caused injury to Capt. Bowden in the form of harm to his personal and business reputation and harm to the reputation of Silver Bank.

52. Defendants did so with negligence and with actual malice. Defendants remained willfully ignorant of the truth by failing over three years' time to ask Capt. Bowden about the truth or falsity of these assertions and did not inform him of the publication of such assertions until after the book *Pirate Hunters* was on book store shelves, despite having had years in which it could have sought the truth prior to publication.

53. Damages suffered by each Plaintiff far exceed $75,000.

54. Accordingly, Plaintiffs are entitled to all damages for defamation allowed by law against Defendants.

## COUNT III
## DEFAMATION (LIBEL) AGAINST ALL DEFENDANTS

55. Paragraphs 1 through 54 above are incorporated into this Paragraph 55.

56. As set out above, Defendants published a book making repeated false assertions and false characterizations throughout the book *Pirate Hunters* that Capt. Bowden was inept in the use of technology, resistant to creative thought and repeatedly placed obstacles in the path of Mr. Chatterton and Mr. Mattera in their search for the *Golden Fleece*.

57. Accordingly, Defendants have published false statements about Capt. Bowden and Silver Bank to third parties. These falsities caused injury to Capt. Bowden in the form of harm to his personal and business reputation and harm to the reputation of Silver Bank.

58. Defendants did so with negligence and with actual malice. Defendants remained willfully ignorant of the truth by failing over three years' time to ask Capt. Bowden about the truth or falsity of these assertions.

59. Damages suffered by each Plaintiff far exceed $75,000.

60. Accordingly, Plaintiffs are entitled to all damages for defamation allowed by law against Defendants.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT
## AGAINST ALL DEFENDANTS

61. Paragraphs 1 through 60 above are incorporated into this Paragraph 61.

62. Defendants knew of a contractual agreement between Silver Bank Expeditions and UA+E. In fact, Defendants published an entire book arising from work purportedly performed under that contract, or, as phrased in *Pirate Hunters,* the "deal" between Capt. Bowden, Mr. Chatterton and Mr. Mattera.

63. Defendants induced Mr. Chatterton and Mr. Mattera to breach the contract, by participating in the publication of a book about the search for the *Golden Fleece* without consent from Capt. Bowden in writing for Mr. Chatterton and Mr. Mattera to so participate, as the Agreement between Silver Bank and UA+E required. This constitutes a breach of Paragraph V of the Agreement.

64. Plaintiffs have been harmed by the breach of Paragraph V of the Agreement in loss of business receipts and other harm in excess of $75,000.

65. Accordingly, Plaintiffs are entitled to any and all damages arising from tortious interference with contract allowed by law against all Defendants.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all triable issues.

**WHEREFORE,** Plaintiffs request relief as follows:

1. On all claims set out herein, judgment against Defendants for money damages in amounts to be determined at trial.

2. Reasonable attorneys' fees and expenses as allowed by law; and

3. Any and all other relief to which they are entitled.

Dated: June 23, 2017

Respectfully submitted,

*s/ Charles Throckmorton*
Charles Throckmorton (FBN 101203)
cthrockmorton@carltonfields.com
Carlton Fields
100 S.E. Second Street, Suite 4200
Miami, Florida 33131
Tel: 305-530-0050
Fax: 305-530-0055

James L. Adams (*pro hac vice* motion to be filed)
Duncan Galloway Egan Greenwald, PLLC
9750 Ormsby Station Road, Suite 210
Louisville, Kentucky 40223
Tel: 502-614-6970
Fax: 502-614-6980
jadams@dgeglaw.com
*Attorneys for Plaintiffs*